UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MAR 30 2026 PM1:43
FILED-USDC-CT-HARTFORD

BRIAN BETTS,
*Plaintiff*,

v.

EDWARD D. JONES & CO., L.P., a limited partnership;
BERKSHIRE HATHAWAY INC., a corporation;
THOMAS COLLEGE, a non-profit corporation;
MATTHEW NADEAU, an individual
LEANNE KENNEDY, an individual, sued in her individual capacity;
JULIA O'LEARY, an individual, sued in her individual and official capacities;
PETER O'LEARY, an individual;
JOHN O'LEARY, an individual;
DAVID O'LEARY, an individual;
DANNY O'LEARY, an individual;
KATE O'LEARY O'HALLARAN, an individual;
RYAN O'HALLARAN, an individual;
JENNIPHER O'LEARY, an individual;
DANIAL O'LEARY, an individual;
WILLIAM STORY III, an individual;

*Defendants*.

**Civil Action No.:** _____

**COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER RELIEF
(JURY TRIAL DEMANDED)**

---

**INTRODUCTION & NATURE OF THE ACTION**

1. This is a civil action arising from a vast, seventeen-year conspiracy among a national financial services firm, a multinational conglomerate, a private educational institution, **an individual acting on behalf of a medical supplier and as a personal landlord,** a corrupt judicial clerk, and a multi-generational family of enforcers to systematically defraud Plaintiff of his generational wealth, violate his fundamental constitutional rights, and inflict catastrophic personal, financial, and emotional destruction. The Defendants formed a de facto criminal enterprise, as

19688-408

defined by the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.

2. The conspiracy was fueled by the fraudulent transfer and concealment of Plaintiff's unique, custodial-held Berkshire Hathaway Class A and B stock—a gift from his grandfather, a former Berkshire Hathaway Inc. executive. The enterprise weaponized their respective powers: **Edward Jones** as the fraudulent broker executing the asset theft; **Berkshire Hathaway** as the complicit issuer profiting from market manipulation and refusing to rectify the fraud; **Thomas College** as a conduit for surveillance, defamation, and harassment; **Matthew Nadeau** as an employer and instrument of arson and murder; **the State of Connecticut** as a provider of governmental impunity and obstruction; **the O'Leary Family** as the on-the-ground enforcers using intimidation, violence, weaponization of family systems, harassment, and exploitation; and **a corrupt judicial clerk** using state authority to silence Plaintiff.

3. This enterprise is further empowered and concealed by a network of non-profit foundations and corporate alliances. **The Harold Alfond Foundation**, which has made significant donations to Thomas College since 2007 and is influenced by Berkshire Hathaway's investment and strategic control, provides a vehicle for funneling unlimited capital and bestowing an aura of legitimacy, further entrenching the enterprise's power across corporate, academic, and philanthropic worlds.

4. The harm inflicted is unparalleled, encompassing not only the loss of assets, cash, and opportunity costs but also a calculated campaign that led to forced institutionalization, the destruction of familial bonds, the premeditated murder of Plaintiff's younger brother, a globally propagated defamation campaign designed to destroy Plaintiff's credibility, the systematic weaponization of state and medical systems against him, and the recent, retaliatory death of his pet bird, "Chirp," orchestrated through the enterprise's control over his food supply. Plaintiff seeks **$1.725 BILLION in compensatory and punitive damages**, the disgorgement of all ill-gotten gains and proceeds obtained through the fraudulent enterprise, and comprehensive injunctive relief to dismantle the ongoing enterprise and prevent further misconduct.

## THE RICO ENTERPRISE: STRUCTURE & SYNERGIES

5. The Defendants constitute an "association-in-fact" enterprise under 18 U.S.C. § 1961(4). They are not random actors but a coordinated unit with a common

purpose: to enrich themselves by stealing and exploiting Plaintiff's assets while using any means necessary to silence him. Their synergies are demonstrated by:

**a. Financial & Intelligence Flow:** O'Leary and Edward Jones provided the mechanism for the initial fraud; Berkshire Hathaway provided the coveted assets and corporate power to conceal it; Thomas College provided access to Plaintiff and a platform for surveillance and defamation; **Matthew Nadeau provided employment, housing, and direct proximity for acts of intimidation and arson;** the O'Learys provided the enforcement and familial coercion; the State of Connecticut provided the cloak of governmental authority and impunity as well as a wiretap of Plaintiffs phone since 2003.

**b. Cross-Entity Influence:** The Harold Alfond Foundation, one of Berkshire Hathaways large shareholders, under the sway of Berkshire Hathaway, financially supports Thomas College, creating a circular and self-reinforcing power structure that blends corporate, academic, and philanthropic fronts to obscure the enterprise's criminal nature. **This network directly facilitated Plaintiff's employment with Matthew Nadeau, Thomas College graduate holding more than one Thomas College degree, demonstrating the flow of influence from the academic institution to individual actors.**

**c. State & Institutional Infiltration:** The O'Learys, through Julia (a former state juvenile executive) and Peter (a former correctional officer), infiltrated the Connecticut state apparatus involving CT state executive Carol. This influence was projected into Massachusetts with the hiring of former Hartford Police Chief Paul Thody as the Chief of the New Bedford Police Department (NBPD), the city where Plaintiff resides. This cross-state collusion directly enabled the brutal excessive force and unlawful psychiatric detention of Plaintiff on October 29, 2024, as detailed in the related case *John Doe v. City of New Bedford, et al.*, 1:25-cv-11645 (D. Mass.). O'Learys have had access to a wiretap on Plaintiff since 2003, which they use to continue orchestrating fraud against Plaintiff.

**d. Integrated Harassment Apparatus:** The enterprise uses a multi-pronged approach to maintain control:
i. **Financial Control:** By stealing Plaintiff's assets, they render him destitute and dependent on systems they can manipulate, such as SNAP benefits.
ii. **Psychological Warfare:** This includes weaponizing his stolen SNAP benefits, where his twin sister, Kathryn Preli, and her felon husband, Michael Preli (an O'Leary associate), change his grocery orders and provide the enterprise with the details, culminating in the deliberate provision of food that killed his pet bird, Chirp.
iii. **Digital Surveillance:** The O'Hallorans, Thomas College, and O'Learys used Google Maps analytics and gas station camera footage to track Plaintiff's movements, later feeding false, defamatory narratives to the newly installed NBPD leadership.

iv. **Judicial Obstruction:** Deputy Chief Clerk Leanne Kennedy, in collusion with Julia O'Leary, actively obstructs Plaintiff's access to the courts and files false police reports against him to retaliate and discredit him.

## JURISDICTION AND VENUE

6. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question), § 1332 (diversity of citizenship), and 15 U.S.C. §§ 78j(b), 78t (securities fraud). Jurisdiction is also proper under 42 U.S.C. § 1983 for civil rights violations.

7. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred within this district, and because multiple Defendants reside in this district.

**a. Defendant Edward D. Jones & Co., L.P.:** Venue is proper as a substantial part of the underlying events occurred in this district, including the fraudulent transfer and mismanagement of Plaintiff's custodial stock accounts, which were administered through its Enfield, Connecticut branch office. Venue is also proper as to Defendant Edward Jones because a substantial part of the events and omissions giving rise to the claims, including its refusal to reinstate wrongfully transferred shares and its collusion with a resident of this district, occurred within and were directed into this district.

**b. Defendant Thomas College:** Venue is proper because a substantial part of the events giving rise to the claims—including the fraudulent monitoring of Plaintiff (then a Connecticut resident), the dissemination of defamatory statements, and the harassment intended to silence him—were directed at and impacted Plaintiff within this district.

**c. Defendant Berkshire Hathaway Inc.:** Venue is proper as a substantial part of the acts in furtherance of the conspiracy occurred in this district, including its collusion with Edward Jones of Connecticut and its refusal to rectify the fraudulent transfer of shares, an injury felt by Plaintiff who was a Connecticut resident at the time the scheme was initiated.

**d. The O'Leary Family Defendants and Defendant Leanne Kennedy:** Venue is proper as all these individual Defendants reside in Connecticut and committed the vast majority of their alleged acts—including threats, intimidation, defamation, stalking, and the obstruction of justice through the state judicial system—within this district.

**e. Defendant Matthew Nadeau.:** Venue is proper as this entity acted in concert with other Defendants, and its role in the alleged conspiracy was directed at and caused harm to Plaintiff who was hired by Matthew Nadeau while he was a resident of CT.

**g.** Furthermore, the culmination of the alleged conspiracy—the premeditated murder of Plaintiff's brother, Connor Betts—occurred within the State of Connecticut, making this district a central and proper venue for adjudicating these claims.

## PARTIES

8. **Plaintiff** is an individual residing in New Bedford, Massachusetts, currently homeless, who was a beneficiary and account holder of investment accounts with Edward Jones involving BRK.A and BRK.B stock.

9. **a. Defendant Edward D. Jones & Co., L.P.** is a financial services firm headquartered at 12555 Manchester Road, St. Louis, MO 63131, and does business throughout the United States including Connecticut and Massachusetts. At all relevant times, it acted as the fraudulent broker executing the asset theft.

**b. Defendant Thomas College** is a private educational institution with its principal place of business at 180 West River Rd, Waterville, ME 04901. At all relevant times, it acted as an agent, conduit, and co-conspirator with Edward Jones, Berkshire Hathaway, Matthew Nadeau, and the O'Learys, leveraging its unique access to and control over Plaintiff to facilitate the fraud and harassment alleged herein.

**c. Defendant Berkshire Hathaway Inc.** is a multinational conglomerate holding company headquartered at 3555 Farnam Street, Omaha, NE 68131. At all relevant times, it acted in concert with Edward Jones, Thomas College, and the O'Learys, using its corporate power and influence to conceal the theft of Plaintiff's assets, manipulate its stock float, and profit from the front-running of Plaintiff's investment ideas, all while refusing to rectify the fraudulent transfer of its shares despite having knowledge of the misconduct.

**d. Defendant Matthew Nadeau** is an individual who, at all relevant times, was an employee, agent, or co-conspirator acting on behalf of Bedard Medical Inc.  Plaintiff was hired by Matthew Nadeau and his parents, who were executives at Bedard Medical, based on their mutual connection to Thomas College, from which Matthew Nadeau graduated with three or more degrees. During Plaintiff's employment, Matthew Nadeau offered him a room in his personal residence, which Plaintiff rented. This proximity was exploited for criminal purposes. Plaintiff is informed and believes that Matthew Nadeau was involved in or had knowledge of the arson that destroyed Plaintiff's grandfather's historic building. Shortly after this fire, Matthew Nadeau lit a lighter in Plaintiff's presence, an act of intimidation. Furthermore, immediately following the murder of Plaintiff's brother, Connor Betts, in February 2014, after Plaintiff wrote on LinkedIn, Matthew Nadeau, who had been told by Plaintiff about his brother and his work as a diesel mechanic, connected with

19688-412

Plaintiff on LinkedIn days before Connor's murder, in a suspiciously timed act that Plaintiff believes was to monitor him or gather information. At all relevant times, Matthew Nadeau acted in concert with Thomas College, the O'Leary Defendants, and other Defendants to further the goals of the criminal enterprise.

**e. The O'Leary Family Defendants** are Plaintiff's relatives and individuals residing primarily in Connecticut. At all times, they acted as agents, co-conspirators, and enforcers for the other Defendants. **Defendants Peter O'Leary, a former state correctional officer and real estate appraiser, and Julia O'Leary, a former state juvenile executive,** leveraged their personal and professional connections within the state of Connecticut to engage in a systematic campaign of defamation, harassment, intimidation, and physical threats designed to isolate Plaintiff, render him destitute, and discredit him to prevent the discovery and recovery of his stolen assets. Their actions were integral to the success and longevity of the fraudulent scheme. Specifically, Plaintiff is informed and believes that Defendant Julia O'Leary, leveraging her position as a former state juvenile executive and her connections within the Connecticut state apparatus, conspired with others to unlawfully obtain and maintain access to a wiretap on Plaintiff's telephone communications beginning in or around 2003. This illegal surveillance was used to monitor Plaintiff's private conversations, gather intelligence to further the fraud, and orchestrate the ongoing campaign of harassment and intimidation against him and his mom. The O'Leary Family Defendants include Peter O'Leary, Julia O'Leary, John O'Leary, David O'Leary, Danny O'Leary, Melania O'Leary, Kate O'Leary O'Hallaran, Ryan O'Hallaran, Jennipher O'Leary, and Danial O'Leary.

**f. Defendant Leanne Kennedy** is an individual residing in Connecticut and is the Deputy Chief Clerk of the Hartford Judicial District. At all relevant times, acting under color of state law but outside the scope of her legitimate authority and in her individual capacity, she conspired with Julia O'Leary and other Defendants to deprive Plaintiff of his constitutional rights. Her actions, as detailed herein, were taken with deliberate indifference and with a retaliatory motive to further the objectives of the criminal enterprise.

**g. Defendant William Story III** is an individual who acted in concert with the O'Leary Defendants to inflict harm upon Plaintiff, including economic sabotage, theft, and participation in a scheme to create a potential murder site.

## FACTUAL ALLEGATIONS

### I. Exploitation of Plaintiff's Unique Position & Familial Trust

10. Plaintiff's BRK.A/B shares—gifted in 1990 by his grandfather, William D. Betts (a Berkshire Hathaway executive from the 1960s-1990s and into later years—were uniquely valuable due to their long-term growth potential, prestige, and Plaintiff's direct familial ties to Berkshire Hathaway leadership.

11. Plaintiff's grandfather started a Berkshire Hathaway Real Estate company in his building, and later Berkshire Hathaway bought the same real estate company where Plaintiff's mother worked as a real estate agent.

## II. Unauthorized Transfers & Breach of Trust

12. Edward Jones exploited Plaintiff's trust and the custodial nature of the stock transfer. Plaintiff's mother held the BRK.A/B stock (registered in Plaintiff's and his father's name (custodial)) after the attorney assigned during the 1990s divorce case to safeguard Plaintiff's stock interest passed away. Plaintiff's mother requested Plaintiff's permission to sell the shares when Plaintiff was 20 years old, explicitly promising that the proceeds would be used to:

i. Pay property taxes for the home where Plaintiff resided;
ii. Provide modest cash distributions to Plaintiff's siblings for fairness; and
iii. Transfer the remaining value to Plaintiff promptly after the sale.

Instead, Edward Jones engaged in systemic misconduct:

13. Fraudulently transferred the shares into the mother's sole account without fulfilling the agreed-upon terms;

14. Fabricated account records, falsely filing a 2011 opening date (instead of the true 2008 date) and closing the original account to obscure the unauthorized transfer;

15. Colluded with Plaintiff's mother, including social engagements (e.g., a cruise) that demonstrate improper coordination and conflicts of interest;

16. Attempted to Gaslight Plaintiff when he inquired in 2008–2012 and again in 2025, leading to 17 years of psychiatric institutionalizations, forced medication, and guardianships—despite Plaintiff's health and competence.

17. For **17 years**, Edward Jones withheld the stock and consideration owed, leaving Plaintiff destitute in more than one way while profiting from the withheld assets.

## III. Fraudulent Concealment and Statute of Limitations Tolling

18. Plaintiff recently fully realized, on or about March 5, 2025, and it was further solidified July 9, 2025, in a letter from Edward Jones and separate letter from

19688-414

Berkshire Hathaway May 19, 2025, that Edward Jones had intentionally concealed key facts related to Plaintiff's financial accounts and the Defendants, including Edward Jones, Berkshire Hathaway, the O'Leary Family, and Thomas College, intentionally concealed key facts and colluded to conceal Plaintiff's ownership and manipulate the market for BRK Inc. shares, violating 15 U.S.C. § 78j(b), including:

a. Shuttering and relocating the Enfield, CT office (786 Enfield Street) without notice;
b. Withholding BRK.A and BRK.B custodial stock;
c. Misrepresenting and failing to disclose the disposition of said shares and funds;
d. All Defendants capitalized on widespread knowledge of Plaintiff's BRK Inc. holdings by leveraging Plaintiff's early investment and family history (secret holding) in Berkshire Hathaway to gain from the public:
- Recruit new Edward Jones customers (e.g., touting Plaintiff's suppression and generational inferiority as leverage to get new customers);
- Enable harassment by third parties (e.g., family, relatives, family friends, people in different communities, different professionals in different industries and organizations), who weaponized Plaintiff's poverty, destitution, and stolen assets to further isolate him for their own reasons given to them by Defendants.

19. The discovery rule tolls the statute of limitations because Plaintiff was subjected to gaslighting, medically marginalized, and subjected to delays and deceptions preventing earlier discovery of the misconduct, and Plaintiff had no reason to suspect Edward Jones of wrongdoing; there was deliberate concealment and misdirecting.

20. The fraud was further concealed because:
a. Plaintiff's forced anti-psychotic prescription drug addiction, recitative stays in mental hospitals, forced long-term community work/live programs, forced/coerced long-term group/assisted home living, financial destitution, and negative or low net worth and income precluded legal action until 2025.
b. Plaintiff's mother, who was forced to commit the fraud and who used Edward Jones' support and advice to fulfill her financial advising needs, wouldn't/won't do what she should have or could do because of Edward Jones' legal, social, and professional assurances, hold attitudes and requirements, and threats and intimidation from the O'Leary Family.
c. Societal/familial/technological/financial world cutoffs.

21. **Defendant's July 9, 2025 Letter Admitting Partial Fraud:**
Edward Jones sent Plaintiff a letter dated July 9, 2025, after Plaintiff sent a demand letter 5/21/25 that was picked up in Maryland Heights 5/27/2025, which was after

two demand letters were mailed to a different Edward Jones address that never arrived. The letter confirmed key elements of the fraud, including:

a. Fabricated account dates (e.g., falsely listing 2011 instead of 2008);

b. Admission of holding Plaintiff's BRK.A share;

c. However, the letter deliberately omitted any reference to Plaintiff's BRK.B shares, further proving:

- Intentional fragmentation of disclosures to obstruct Plaintiff's ability to trace all assets;

- Bad faith in acknowledging only the most valuable portion of the stolen holdings (BRK.A).

22. An Edward Jones employee admitted, "We do it all the time," acknowledging a systemic practice designed to evade accountability.

### IV. Collusion with Thomas College and Market Manipulation

23. While Plaintiff was a student at Thomas College (a small private Waterville, Maine Business School) before graduating in December 2011, he privately disclosed his Berkshire Hathaway familial ties to a trusted friend in 2010, as well as personal private internet use on school computers in 2007–2008, but otherwise kept them confidential.

24. In 2010, Plaintiff was actively buying Apple (AAPL) and Bank of America (BAC) stock in his college dorm room, which Berkshire Hathaway miraculously acquired shortly thereafter, suggesting Edward Jones and/or Berkshire Hathaway monitored Plaintiff's investments and used insider knowledge to guide Warren Buffett's purchases (yielding $100 billion or more in profits).

25. Thomas College affiliates, leveraging the school's intimate network and criminal justice program connections, began a campaign of surveillance and defamation:

a. Someone at Thomas College started a rumor Plaintiff put a banana in his butt;

b. In 2011, Berkshire Hathaway finalized a Lubrizol purchase;

c. Thomas College collected that Plaintiff was taking a valuation class online in his free time;

d. In 2011, a professor who claimed to be a Berkshire Hathaway employee's daughter or granddaughter randomly held a banana up in her retail management class without using any words before, during, or after; same as defendant Mathew Nadeau held up the lighter.

e. Maurizio Cattelan, an artist, created "Comedian" in 2019, a banana duct-taped to a wall;

f. Byrna (best non-lethal self-defense products) commercials is another example.

19688-416

This timing implies collusion between Edward Jones, Berkshire Hathaway, and Thomas College affiliates to exploit Plaintiff's financial activity for corporate gain.

26. **The "Banana" Defamation Campaign:**
In or around 2011, affiliates of Thomas College, leveraging the small, private, and intrusive nature of the institution, willfully fabricated and disseminated a globally propagated, sexually humiliating rumor that Plaintiff had "put a banana in his butt." This act was designed to slander, sexually harass, and publicly ridicule Plaintiff, exploiting his well-known and fiercely private nature to cause maximum personal and reputational damage. The rumor was propagated globally, becoming a widespread inside joke within the financial and professional communities connected to Defendants, effectively branding Plaintiff and sabotaging his credibility while third parties profited.

27. **Commercialization of the Defamation:**
The defamatory campaign was not confined to private ridicule but was later commercialized for profit. Defendants and their affiliates launched a public sporting event named "Banana Bowl," a name directly co-opting and amplifying the specific, humiliating rumor originated against Plaintiff. This event, promoted through channels associated with Defendant Thomas College and its network, transformed the targeted harassment into a revenue-generating enterprise, further cementing the defamation in the public sphere and demonstrating a complete disregard for the severe harm inflicted upon Plaintiff. This act shows the conspiracy's evolution from private harassment to public, profit-driven exploitation.

## V. Berkshire Hathaway's Complicity & Obstruction

28. Despite Plaintiff's formal demand (May 5, 2025) and Berkshire's acknowledgment (May 19, 2025), both Berkshire Hathaway and its transfer agent, Equiniti, have:
i. Refused to reinstate or verify Plaintiff's BRK.A/B shares, even though custodial ownership was jointly registered under Plaintiff and his father's names July 31, 1990;
ii. Demanded unreasonable documentation (e.g., certificate numbers, forms) and haven't acknowledged the shares and stocks before and after promising Equiniti would send documents after doing research to send Plaintiff through the process again, while knowing Edward Jones fabricated records (e.g., false 2011 account date);
iii. Deflected responsibility to Edward Jones, despite Berkshire's duty to maintain accurate shareholder records under SEC rules.

29. Berkshire Hathaway and Equiniti have engaged in a pattern of deceptive and obstructive conduct designed to prevent Plaintiff from recovering his shares. This

includes:

    a. Failing to respond as promised in the May 19, 2025 letter;

    b. Requesting information that Plaintiff has already provided multiple times;

    c. Ignoring Plaintiff's legitimate inquiries while hiding behind procedural pretexts.

This behavior is consistent with a broader strategy to avoid accountability and perpetuate the fraud orchestrated by Edward Jones.

## VI. Mutual Benefit to Edward Jones and Berkshire Hathaway

30. Defendants Edward Jones and Berkshire Hathaway share the same investor demographic (e.g., long-term, 'buy-and-hold' clients), and both profit from:

    i. Artificially suppressing Plaintiff's shares:

    - Edward Jones gains fees/commissions by retaining control;

    - Berkshire Hathaway benefits from reduced float (increasing scarcity/perceived value of BRK shares).

    ii. Leveraging Plaintiff's familial ties:

    - Edward Jones used Plaintiff's association with Berkshire Hathaway to recruit clients;

    - Berkshire Hathaway tolerates Edward Jones' misconduct to maintain its reputation among retail investors.

## VII. Enforcement, Intimidation & Physical Harm

### A. The O'Leary Family as Enforcers

31. The O'Leary family have a long history of financially exploiting Plaintiff's mother, Kathleen Betts. Throughout the 1990s and 2000s, they exerted pressure on her to provide them with family funds and loans. This established a pattern of coercion and control. When Plaintiff became 18–20, the age necessary to access his stock, the O'Learys' campaign intensified.

32. The O'Learys could not tolerate Plaintiff's inherited wealth, driven by envy: "He'll work, we worked, we had to work."

33. Understanding that Plaintiff was the rightful owner and the primary obstacle, the O'Leary Defendants launched a multi-faceted campaign to neutralize him:

### a. Weaponizing Trauma and Coercion:

The O'Learys systematically exploited the sexual assault of their daughter, Jessica O'Leary, by **Defendant William Story III** around 2004. Rather than pursue justice against Story, Peter and Julia O'Leary instead conspired with him to weaponize the event against Plaintiff. Following the assault, which occurred in the O'Learys' basement, Peter O'Leary secured

19688-418

Story a job finishing the basement of Julia's mother's home in Stafford, CT. It was in this basement that William Story III constructed a sealed plastic room under the guise of renovation, which he configured as a potential murder site for Plaintiff after Plaintiff was coerced into performing extensive unpaid labor for Story, including sanding walls within this sealed room and working many months on the project with no other option initially as a grounded teenager, then again after getting paid a small amount.

**b. Direct Coercion and Threats:**
In or around 2010, after Plaintiff brought up his stock to his mother, Peter O'Leary drove Plaintiff to the Stafford, CT house under false pretenses for an interrogation in the vehicle, demanding that Plaintiff falsely confess to culpability in Jessica O'Leary's rape, with the implied threat of being stranded in a remote location or physical harm. This was coupled with threats and coercion directed at Plaintiff's mother or her children to further isolate him.

**c. Economic Sabotage & Theft:**
William Story III further participated in the economic sabotage against Plaintiff by stealing tools, supplies, and Plaintiff's father's electronics and things from Plaintiff's former home— his mother's house in Suffield, CT—from which he has been unjustly excluded. Story didn't pay Plaintiff for other jobs he worked, including a roof replacement and work at O'Leary's property on Belgrade Lake.

**d. Physical Intimidation and Threats:**
Defendants Peter, John, Danny, and David O'Leary engaged in direct threats of violence, including threats to "hunt you down and break your neck" and hanging a minor over a fire pit. John O'Leary also sabotaged Plaintiff's boat, creating a potentially fatal hazard.

**e. Stalking and Surveillance:**
Jennipher O'Leary, a Connecticut state employee who has confessed homicidal ideation towards Plaintiff, tracked him to his home in New Bedford, MA, and befriended his neighbor to "pirate information" and continue the harassment campaign. The family displays an obsessive interest in his whereabouts and life.

**f. Collusion with Institutional Defendants:**
The O'Leary Defendants did not act alone. Their campaign was enabled by, and in turn enabled, the institutional Defendants:

- **Thomas College:** John O'Leary colluded with affiliates at Thomas College during Plaintiff's attendance to "make the fraud worse" and "pirate into [his] personal and professional life more," coinciding with the defamatory "banana" rumor spread by College affiliates.

19688-419

- **Law Enforcement & Judicial Systems:** Julia O'Leary, a former CT state juvenile executive, used her connections to influence systems and manipulate outcomes.

## B. Retaliatory Acts Against Plaintiff

34. After Plaintiff's 2013 employment in Maine (secured via Thomas College connections and **through Defendant Matthew Nadeau at Bedard Medical**), his grandfather's Berkshire-linked New Bedford building was mysteriously set ablaze, causing catastrophic damage. Days later, a Thomas College graduate, Matthew Nadeau theatrically lit a lighter in Plaintiff's presence, implying intimidation.

35. When Plaintiff later mentioned Berkshire Hathaway privately to 12 LinkedIn connections (mostly Thomas College affiliates), he received a suspicious new connection request, followed within 72 hours by his brother Connor's electrocution death in Connecticut involving/using a truck ordered to Maine.

36. Two nights after Connor's funeral, Plaintiff was forcibly detained by police, institutionalized, and subjected to coerced mental healthcare—while St. Luke's Hospital (where he was held) invested in a new high-security psychiatric facility in 2015, later used to confine Plaintiff in 2024 and again in 2025 into 2026.

## C. The Murder of Connor Betts

37. The culmination of the enterprise's violence was the **premeditated murder** of Plaintiff's brother, Connor Betts, in February 2014. Connor was electrocuted while working as a diesel mechanic, using a truck ordered to Maine where Plaintiff worked for Bedard Medical, a Thomas College-connected entity. His murder was a foreseeable act to eliminate a potential ally for Plaintiff, secure the stolen assets permanently, protect the profits of Edward Jones and Berkshire Hathaway, and protect the conspiracy.

38. This premeditated murder was committed:
a. **With Malice Aforethought:** The intent to kill was formed to further the conspiracy.
b. **Under Heinous, Atrocious, or Cruel (HAC) Circumstances:** It was designed to inflict maximum psychological terror on Plaintiff. Plaintiffs brother Connor was electrocuted with power lines.
c. **For Financial Gain / Pecuniary Gain:** To eliminate a potential ally for Plaintiff, secure the stolen assets permanently, and protect the profits of Edward Jones and Berkshire Hathaway.
d. **As Part of the Conspiracy:** The O'Leary Defendants and Matthew Nadeau carried

out the act, enabled by Thomas College and the institutional Defendants' financial motive and cover-up.

39. The Defendants engaged in a concerted effort to conceal their crime for over a decade, perpetuating additional frauds and inflicting continued emotional distress on the victim's family. The subsequent twelve-year cover-up, making the death appear accidental while continuing the underlying fraud, constitutes further obstruction of justice. The Defendants demonstrated a complete lack of remorse, as evidenced by their continued profiteering from the stolen assets, their deflection of responsibility, and their ongoing harassment of Plaintiff to this day.

**D. Orchestrated Police Brutality & Medical Torture**

**E. The Death of Chirp & SNAP Exploitation**

40.  The O'Learys' influence within the Connecticut judicial and law enforcement systems directly enabled the events of October 29, 2024, where NBPD officers, accompanied by a clinician (Jane Doe), unlawfully entered Plaintiff's apartment, subjected him to excessive force (including tasering and pressing a firearm to his head), forcibly medicated him, and had him involuntarily committed for 63 days of torture. This incident is the subject of a separate, but integrally related, federal lawsuit: John Doe v. City of New Bedford, et al., 1:25-cv-1164 (D. Mass.).

41.  The O'Learys are connected to and partially responsible for or influencing/trying to influence the recently hired former Hartford, CT police chief as the New Bedford, MA police chief. The new New Bedford Chief was hired after the early retirement of the former chief due to a female New Bedford police department clinician and a couple New Bedford Police Officers nearly beating Plaintiff to death using their bodies and weapons and handcuffs in his apartment before sending him to St. Luke's Emergency room and having him locked in Southcoast Behavioral Health's facility for 2 months (Oct. 30–Dec. 31).  The police brutality incident on October 29, 2024, was a direct result of the ongoing fraud. The false emergency mental health crisis call, which led to officers unlawfully entering Plaintiff's apartment, tasering him, pressing a firearm to his head, and forcibly detaining him for 63 days, was orchestrated by the enterprise to silence Plaintiff and further obstruct his recovery of stolen assets. This action proves the O'Learys are using state apparatus to obstruct justice and perpetrate the ongoing fraud.

42. Rendered destitute, Plaintiff is dependent on SNAP benefits. The enterprise systematically controls this necessity, forcing him to send orders to his twin sister, Kathryn Preli (wife of felon Michael Preli, an O'Leary associate), who changes the orders and provides the details to the O'Learys. Through this channel, the enterprise

deliberately provided food that resulted in the death of Plaintiff's pet bird, Chirp, on September 7, 2025—a calculated act of cruelty to inflict maximum emotional distress.

## VIII. The State of Connecticut's Role in the Enterprise: Official Obstruction and Impunity

43. The State of Connecticut, through its agents and agencies, provided the essential cloak of government authority and impunity that enabled the O'Leary Defendants and their associates to operate as the enforcement arm of the enterprise without consequence.

44. **Systematic Enablement of the O'Leary Family:** For over two decades, the State was aware of the O'Leary family's criminal propensity, beginning with a pyramid scheme in the 1990s for which they were never prosecuted. Despite this knowledge, the State, through its welfare and judicial systems, continuously funded and enabled their behavior. Defendant Julia O'Leary, a former state juvenile executive, and her daughter Jennifer O'Leary, a current state employee, have leveraged state resources and influence to harass Plaintiff and protect the family's drug-related activities and violent tendencies from legal scrutiny.

45. **Direct Obstruction of Justice by Judicial Agents:** The State's participation moved from passive enablement to active obstruction in September 2025. When Plaintiff attempted to file emergency ex parte restraining orders (JD-FM-137) on behalf of his mother, Kathleen Betts, against O'Leary-associated enforcers (Rodriguez, Preli, Romano, Kopickbay), **Deputy Chief Clerk Leanne Kennedy of the Hartford Judicial District, acting under color of state law, refused to accept the applications.**

46. This refusal was a deliberate, bad-faith act intended to keep Plaintiff's mother vulnerable to the enterprise's intimidation tactics. When Plaintiff persisted, Clerk Kennedy, in collusion with Julia O'Leary, retaliated by **filing a false police report with the Connecticut State Police**, alleging Plaintiff had made threats or was a danger. This was a calculated attempt to have Plaintiff arrested or institutionalized to silence him and halt his efforts to expose the conspiracy and protect his family, constituting witness intimidation and obstruction of justice under 18 U.S.C. §§ 1512, 1503.

47. **Collusion with Law Enforcement:** The enterprise's influence extends into law enforcement. The O'Leary Defendants, through their state connections, have actively influenced or attempted to influence the appointment of the former Chief of

19688-422

Police of Hartford, CT, as the new Chief of Police in New Bedford, MA—the city where Plaintiff resides. This is a clear attempt to project their coercive power across state lines and further obstruct Plaintiff's ability to seek protection from local law enforcement.

48. **State-Sanctioned Harassment:** Defendant Jennifer O'Leary, a state employee who has confessed homicidal ideation towards Plaintiff, engages in stalking across state lines and colludes with Plaintiff's neighbors, all while being protected from consequences by the state apparatus her family influences. The State's failure to act on her behavior, and its provision of benefits that fund the O'Leary family's lifestyle (including supporting their drug-addicted daughter), demonstrates a pattern of intentional and reckless conduct that furthered the goals of the enterprise.

## IX. UNLAWFUL ELECTRONIC SURVEILLANCE AND WIRETAPPING

49. Beginning in or around 2003, and continuing for an extended period thereafter, Defendants Julia O'Leary, acting in concert with other Defendants and unnamed co-conspirators, engaged in a systematic and illegal program of electronic surveillance directed at Plaintiff.

50. This surveillance included the unlawful interception of Plaintiff's wire, oral, and electronic communications (a "wiretap") without his knowledge or consent. This was done without a valid court order, without any law enforcement purpose, and in furtherance of the criminal enterprise's goal to monitor, control, and ultimately destroy Plaintiff.

51. The wiretap was used to:
a. Monitor Plaintiff's private conversations with family members, potential allies, and professionals to gather intelligence for the fraud campaign;
b. Track Plaintiff's movements, financial activities, and personal relationships;
c. Identify and exploit his vulnerabilities to facilitate the campaign of harassment, defamation, and institutionalization detailed herein;
d. Provide the O'Leary Defendants and their co-conspirators with advance warning of Plaintiff's efforts to discover the financial fraud or seek legal recourse;
e. Coordinate the fraudulent activities of the enterprise across state lines and among the various Defendants.

52. This illegal wiretapping was part of the "integrated harassment apparatus" described in Paragraph 5(d) and was essential to the success and longevity of the overarching conspiracy. The information obtained through this unlawful surveillance was used

to further the predicate acts of wire fraud, witness tampering, and obstruction of justice.

## X. Breach of Fiduciary Duty and Financial Fraud

53. **Defendant's Fiduciary Breaches:**
Edward Jones, as a licensed broker-dealer and financial advisor, owed Plaintiff fiduciary duties of loyalty, prudence, and full disclosure when handling his BRK.A/B shares. Despite these obligations, Defendant breached its duties by:

### a. Fraudulent Inducement of Authorization:

Plaintiff signed a transfer authorization based on Edward Jones' false representations that:
i. The proceeds would pay property taxes for his home;
ii. Modest distributions would be made to his siblings; and
iii. The remaining value would be promptly transferred to Plaintiff.

Edward Jones knowingly violated these terms, transferring Plaintiff's shares into his mother's sole account without fulfilling the agreed-upon obligations (planned in advance while unknown to Plaintiff), constituting fraud and failure of consideration.

### b. Collusion and Concealment:

### 1. Fabrication of Account Records:

Falsely filing a 2011 account opening date (via the attached "Letter of Authorization," dated 2/25/2011) to obscure the actual 2008 transfer of Plaintiff's BRK.A/B shares. Purposely omitting Plaintiff's BRK.B shares from its July 2025 disclosure letter, despite admitting to holding his BRK.A shares—a selective disclosure meant to obstruct Plaintiff's ability to trace all stolen assets.

### 2. Active Concealment of Diversion:

Edward Jones actively concealed the diversion of Plaintiff's assets by consistently failing to disclose the complete destination, status (sold or held), and transfer records of the BRK.A and BRK.B shares despite Plaintiff's repeated inquiries. Defendant provided only misleading partial records while withholding critical documents that would reveal the assets' location. Furthermore, Edward Jones engaged in a pattern of obstruction by directing Plaintiff to seek restitution from his mother—a course of action Defendants knew was futile given its own central role in advising her and facilitating the transfer.

### 3. Coordinated Effort to Obstruct Justice:

Relocated offices (e.g., shuttering the Enfield, CT branch) to obscure the timeline of fraudulent transfers and actively prevent Plaintiff from locating the original office where the fraud was executed, thereby impeding his ability to gather evidence or reconstruct events.

Edward Jones and Berkshire Hathaway Inc. cited "semi-retirement" of key employees to justify non-disclosure and remain unaccountable while continuing to profit from the withheld assets.

**c. Statutory Violations:**

**1. SEC Rule 10b-5 (17 C.F.R. § 240.10b-5):**
Fraudulent misrepresentation by misleading Plaintiff about the purpose of the transfer and fabricating account records.

**2. FINRA Rules:**

- Rule 2090 (Know Your Customer): Failed to act in Plaintiff's best interest by disregarding the agreed-upon terms of the transfer.
- Rule 2150 (Improper Use of Customer Securities): Facilitated an unauthorized transfer of Plaintiff's shares to his mother's account.

**3. Sarbanes-Oxley Act (SOX) Violations:**

- § 302 (Certification of Financial Controls): Defendant's falsification of account records (e.g., filing backdated 2011 authorization form) constitutes fraudulent certification of financial documents.
- § 404 (Internal Controls): Failed to maintain adequate controls to prevent unauthorized asset transfers and concealment of Plaintiff's ownership.
- § 806 (Whistle-blower Protection): Retaliated against Plaintiff by obstructing his inquiries and concealing records, effectively punishing him for attempting to expose the fraud.

**d. Retention of Assets:**
Refusing to return Plaintiff's shares or proceeds for 17 years, despite his rightful ownership. Ignoring Plaintiff's demands for accountability, demonstrating willful misconduct.

**e. Exploitation of Trust:**
Leveraging Plaintiff's trust in his mother and Edward Jones' professional standing to fraudulently secure authorization. The transfer is legally void because:
i. It lacked valid consideration (Plaintiff received nothing);
ii. It violated the original custodial ownership (Plaintiff + father);
iii. It was obtained under deceptive pretenses.

**f. Coercion and Threats of Destitution:**
Defendant pressured Plaintiff into authorizing transfers under duress, including implicit

19688-425

threats that refusal to sign documents would result in immediate homelessness. Edward Jones representatives created a false binary choice, forcing Plaintiff to believe that if he did not comply, he would be left destitute outside their office with no support. This coercion exploited Plaintiff's family system, social, financial, and geographical vulnerability (lack of alternatives), rendering any purported "consent" to transactions legally invalid.

**g. Bad Faith and False Promises:**

- Deliberate delays (e.g., fabricated account dates, office relocations);

- False pretenses (e.g., promises to "open an account" or provide cash considerations);

- Active obstruction when Plaintiff sought accountability (e.g., ignoring inquiries, withholding documents, promising callbacks, citing semi-retirement).

Defendant's conduct demonstrates a systemic pattern of fraudulent inducement: enticing Plaintiff to acquiesce to asset transfers while knowingly retaining the proceeds indefinitely.

54. Edward Jones' employees operate under a systemic culture of deception and high-pressure exploitation that enabled these breaches.

## XI. Unjust Enrichment and Disgorgement

55. Berkshire Hathaway's refusal to reinstate Plaintiff's shares allowed Edward Jones to retain illicit profits from managing 'orphaned' assets. Defendant Edward Jones was unjustly enriched at Plaintiff's expense through systemic misconduct, including but not limited to:

a. Fraudulent Inducement of Asset Transfers: Defendant secured Plaintiff's nominal authorization for transfers (e.g., of BRK.A/B shares) through high-pressure tactics and deceptive assurances—including promises to "open an account" and provide cash considerations—while systematically obstructing Plaintiff's ability to retain or monitor the assets.

b. Retention of illicit profits, including commissions, fees, new customers, better office, respect in communities, and other financial benefits derived from:

- Unauthorized transactions;

- Concealment or diversion of Plaintiff's investments;

- Exploitation of Plaintiff's incapacitation or lack of access to account records;

19688-426

- Culture of parents getting ahold of equities and cash from grandparents to grandchildren through a transfer/hold technique (office lady said "we do it all the time");

- New client acquisitions driven by Plaintiff's BRK association (e.g., "If Kathleen Betts invests here, you should too");

- Enhanced brand reputation in the community by falsely appearing to manage high-value BRK holdings and manage generational wealth;

- Commission-based gains from facilitating BRK purchases for others while freezing Plaintiff's access.

- Profits from Berkshire Hathaway's AAPL/BAC trades: Edward Jones and Berkshire Hathaway colluded to front-run Plaintiff's investments, using his trading activity (and familial ties) to inform Buffett's decisions.

- Thomas College's role: The school's access to Plaintiff's computers, iPod Touch, internet activity, social, professional life, personal life, healthcare, and family connections enabled its affiliates and other Defendants, including Matthew Nadeau, to carry out harassment and physical retaliation (e.g., arson, brother's death).

56. Thomas College mailed Plaintiff's student financial aid refund checks to Connecticut in 2007; Plaintiff didn't get the money. In 2008, Thomas College was told in person and electronically to hold the check in the campus office, and Thomas College mailed it anyway. Plaintiff didn't get a student financial aid refund check until the fall 2010. Plaintiff started college in the fall of 2007.

57. Pursuant to equitable principles and statutory remedies, Defendant must disgorge all profits obtained through its wrongful conduct, including:

a. The full market appreciation of Plaintiff's BRK.A and BRK.B shares, which were wrongfully withheld, diverted, without authorization, and possibly liquidated;

b. All gains derived from the long-term misuse of Plaintiff's assets, including interest, capital growth that rightfully belonged to Plaintiff but were unlawfully retained or concealed by Defendant.

c. **Disgorgement of Secondary Gains:**
Defendant must disgorge:

- Revenue from BRK-related trades by other clients influenced by Plaintiff's stolen holdings;

19688-427

- Intangible benefits (e.g., office prestige, recruiter bonuses) tied to exploiting Plaintiff's assets.

d. **Failure of Consideration (Quid Pro Quo):**

Plaintiff's authorization for transfers was predicated on specific promises (e.g., property tax payments, cash distributions, and residual value transfer), which Edward Jones never fulfilled. This constitutes a failure of consideration—Plaintiff received no benefit from the transactions, while Defendant retained all gains. Edward Jones' retention of profits without upholding its end of the agreement is a classic unjust enrichment.

e. **Invalid Assignment of Plaintiff's Assets:**

Any purported "assignment" of Plaintiff's BRK.A/B shares to his mother's account was legally void, as:

- It lacked valid consideration (no value was provided to Plaintiff in return);

- It violated the original custodial agreement (joint registration under Plaintiff and his father's names);

- It was obtained through coercion and fraudulent inducement.
  Edward Jones cannot claim lawful ownership of assets acquired through such misconduct.

**XII. Lost Economic Opportunity & Career Sabotage**

58. Despite earning a Bachelor of Science in business (2011) and Master of Science in business (2021) and maintaining employment at multiple companies, Plaintiff was systematically prevented from:

   - Building meaningful savings due to Edward Jones' theft of his BRK.A/B shares;

   - Investing in other opportunities to offset or catch up to the stolen assets;

   - Benefiting from Berkshire Hathaway's historic growth (BRK.A grew substantially during this period);

   - Achieving financial stability, as Defendant's actions forced Plaintiff to survive on marginal wages while institutionalized.

59. **Lost Unique Asset and High-Reward Investments:**
   Due to Edward Jones' fraudulent withholding of Plaintiff's assets and the resulting forced institutionalizations, Plaintiff was deprived of critical opportunities to:

19688-428

a. **Acquire a historic family property:** Plaintiff's grandfather owned a one-of-a-kind building with significant ties to Berkshire Hathaway's history. Plaintiff was unable to assume ownership or leverage its value because Edward Jones:

- o Rendered him financially destitute (unable to pay taxes, fees, or negotiate terms);

- o Forced him into institutionalized labor at Spring Lake Ranch (2008–2014), physically preventing him from asserting his rights.
  This building held immense personal, familial, and financial value—its loss is irreplaceable.

b. **Invest in high-growth assets:** As a young, educated, and ambitious investor in his 20s, Plaintiff would have capitalized on high-reward opportunities like Bitcoin. For example:

- o In 2009–2011, Plaintiff learned about Bitcoin (then priced at ~$2.00) and was prepared to invest hundreds of dollars—a sum Edward Jones' theft made impossible.

- o As of September 17, 2025, Bitcoin trades at $116,529.79, representing a catastrophic lost return of 40,180,517%. Edward Jones' misconduct directly blocked Plaintiff from participating in this and similar market-defining investments, including purchasing foreclosed properties because of the 2008 financial crisis Edward Jones and Berkshire Hathaway instigated.

## XIII. Intentional Infliction of Financial and Emotional Distress

60. Defendant's actions led to:

a. Financial ruin, social stigma, slavery (Spring Lake Ranch), and harassment from relatives, professionals, and others;

b. The loss of relationships, health, housing, and enjoyment of life, including the severing of Plaintiff's relationship with his brother, Connor, due to:

- Plaintiff's financial destitution (preventing him from aiding Connor's career);

- Plaintiff's institutionalization, which physically separated them;

- Connor's subsequent death under avoidable circumstances;

- The defamatory portrayal of Plaintiff during separation and estrangement from Connor (e.g., Plaintiff abandoned his brother, Plaintiff is mentally ill, sick, alcoholic, no good, hateful, stupid).

c. Plaintiff being forced on prescribed prescription drugs and into group living under manufactured dependency;

d. Deliberate efforts at psychological manipulation and efforts to gaslight, including lying to and stalling Plaintiff about the stolen assets in 2008/2009 and 2025, leading to forced and prolonged psychiatric care.

61. **Institutionalization Timeline:**

- 2008: East Granby Family Practice Primary Care, East Granby CT

- 2008: Saint Francis Hospital, Hartford CT ER

- 2008: Mount Sinai Hospital, Hartford CT

- 2008: Community Health Resource, Enfield CT

- 2011: Suffield CT Ambulance & Crisis Unit

- 2011: Saint Francis, Hartford CT Emergency Room

- 2011: Mount Sinai, Hartford CT

- 2012: Suffield CT Ambulance & Crisis Unit

- 2012: Hartford Hospital Emergency Room

- 2012: Institute of Living, Hartford CT

- 2012: Institute of Living Day Program, Hartford CT

- 2013: Hartford Hospital Emergency room

- 2013: Institute of Living, Hartford CT

- 2013: Institute of Living Day Program, Hartford CT

- 2013: Cape Cod ER

- 2013: Cape Cod ER Ambulance Service

- 2013: Carney Hospital, Boston MA

- 2013: Southcoast Massachusetts Day Program

- 2013: Mattapoisett MA Ambulance

- 2014: St. Luke's, New Bedford MA ER

- 2014: St. Luke's, New Bedford MA

19688-430

- 2014–2025: Boston Medical Center Department of outpatient psychiatry

- 2014: Spring Lake Ranch Community Living/Prison/Slave Camp, Rutland Vermont

- 2014: EIKOS Group Home, Commonwealth Avenue, Brighton MA, Boston Group Home

- 2014: The office of Dr. Abbas Zaidi, St. Elizabeth's, Brighton Marine

- 2014: The Freedom Trail Clinic, Boston Massachusetts

- 2024: Key West Ambulance/Crisis Unit

- 2024: Key West ER

- 2024: Dapoo Hospital, Lower Keys

- 2024: New Bedford Ambulance

- 2024: St. Luke's Hospital, New Bedford ER

- 2024: Southcoast Behavioral Health Psychiatric Facility, New Bedford, MA

- 2025: St. Luke's Infusion/Injection Clinic

62. Defendant slept an average of 12 hours every night for 16 years consecutively due to forced anti-psychotic drugs (Seroquel and Olanzapine), causing physical deterioration (weight gain, tremors) without medical justification.

## XIV. Patterns of Misconduct

63. **Systemic Exploitation of Retail Investors:**
Edward Jones' fraud against Plaintiff reflects a broader pattern of:

   o Targeting investors who lack recourse;

   o Using high-pressure tactics to extract authorizations under duress;

   o Weaponizing social stigma (e.g., painting victims as "incompetent") to deter claims.

64. **Sabotage of Generational Wealth:**
Defendant's fraud inflicted generational harm, severing Plaintiff's ability to sustain or build upon family assets (e.g., the Berkshire Hathaway-linked building) that were meant to benefit both his and future generations. Edward Jones' fraud extended beyond Plaintiff's immediate assets to destroy his ability to preserve or grow generational wealth, including:

19688-431

- **Historic property loss:** By impoverishing Plaintiff and forcing institutionalizations, Defendant ensured he could not inherit or manage family assets (e.g., the Berkshire Hathaway-linked building, Berkshire Hathaway stock).

- **Suppression of high-growth investments:** Defendant's actions systematically prevented Plaintiff from diversifying into alternative assets (e.g., Bitcoin, real estate), which would have offset the stolen BRK shares' value.

- Defendant's fraud also shattered relationships, including Plaintiff's bond with his brother, whose untimely death was exacerbated by the financial instability Edward Jones inflicted.

65. **Collateral Harm:**
    Defendant's actions caused:

    - **Market distortions:** Artificially inflating Berkshire Hathaway demand by hiding Plaintiff's withheld shares;

    - **Reputational and Social Harm:** Defendant's systemic fraud and collusion with third parties inflicted severe reputational harm on Plaintiff by:

        - **Weaponizing Plaintiff's financial ruin:** Edward Jones employees and associates publicly mocked Plaintiff's poverty (e.g., "If Kathleen Betts invests here...") to recruit clients, portraying him as a "failed beneficiary" of generational wealth.

        - **False stigmatization:** Defendant enabled relatives, family, professionals, and community members to label Plaintiff as "mentally incompetent," "ungrateful," or "unstable" to justify the theft of his assets; deter scrutiny of Edward Jones' misconduct; and isolate Plaintiff from potential allies or legal support.

        - **Loss of professional standing:** As an educated professional, Plaintiff's credibility was undermined by Defendant's false narratives, costing him career opportunities and social capital.

This reputational harm is inextricable from Defendant's financial fraud, as it:

1. Deepened Plaintiff's isolation and institutionalization;

2. Enabled Edward Jones to retain stolen assets unchallenged;

19688-432

3. Caused additional economic losses (e.g., lost employment, networking opportunities).

## XV. Non-Economic and Dignitary Harms

66. Beyond financial losses, Plaintiff suffered irreparable dignity harm:

   o **Bodily Integrity Violations:** Forced anti-psychotic drugs caused physical deterioration (weight gain, tremors) without medical justification.

   o **Familial Estrangement:** Defendant's use of Plaintiff's mother severed lifelong bonds, leaving Plaintiff isolated and homeless.

   o **Public Humiliation:** Edward Jones employees mocked Plaintiff's poverty, forced healthcare, education, experience, and work ethic to recruit clients at his expense.

   o **Loss of Life Opportunities:** 17 years of institutionalizations (2008–2025) deprived Plaintiff of education, employment, wealth building, and family formation.

67. **Destruction of Familial Bonds:**
   Defendant's fraud deprived Plaintiff of critical years with his younger brother, Connor Betts, who died in February 2014 while working as a diesel mechanic. Had Edward Jones honored its obligations:
   i. Plaintiff and Connor would have had the financial stability to pursue safer, more meaningful work (e.g., Plaintiff could have supported Connor's career choices);
   ii. The brothers would have shared opportunities (e.g., joint investments, education, or simply time together) that were stolen by Plaintiff's forced impoverishment and institutionalizations.
   Instead, Connor's need to work tirelessly—and Plaintiff's inability to assist due to Defendant's theft—left them estranged during some of Connor's short life. This loss is irreparable.

## CLAIMS FOR RELIEF

## COUNT I – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. § 1962(c))
## (Against All Defendants)

68. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69. At all relevant times, the Defendants constituted an "association-in-fact enterprise" as defined by 18 U.S.C. § 1961(4), engaged in, and whose activities affected, interstate and foreign commerce.

70. Each Defendant was employed by or associated with this enterprise.

71. Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a **pattern of racketeering activity**, as defined by 18 U.S.C. § 1961(5). This pattern included multiple acts indictable under:

a. **Wire Fraud (18 U.S.C. § 1343):** Through electronic communications to facilitate the financial fraud, concealment, and coordination of harassment.

b. **Mail Fraud (18 U.S.C. § 1341):** Through the use of the U.S. Postal Service to send fraudulent account statements, correspondence, and to further the conspiracy.

c. **Obstruction of Justice (18 U.S.C. § 1503 et seq.):** Through the concerted, 12-year cover-up of the murder of Connor Betts and the ongoing concealment of the financial fraud.

d. **Witness Tampering (18 U.S.C. § 1512):** Through a campaign of harassment, intimidation, murder, and the retaliatory filing of a false police report by judicial officials to obstruct Plaintiff's access to the courts and prevent the exposure of this conspiracy.

e. **Illegal Wiretapping and Electronic Surveillance (18 U.S.C. § 2511):** By intentionally intercepting, disclosing, and using Plaintiff's wire and electronic communications without lawful authorization, in violation of the federal Wiretap Act. This activity constitutes a "racketeering activity" as it is indictable under Title 18, and it was committed in furtherance of the enterprise's scheme to defraud and silence Plaintiff.

72. This pattern of racketeering activity is related and has continued over a period of years, from at least 2003 to the present, constituting a **long-term criminal conspiracy**.

73. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property by the loss of his assets, income, and livelihood, entitling him to treble damages under 18 U.S.C. § 1964(c).

---

**COUNT II – SECURITIES FRAUD (Rule 10b-5, 15 U.S.C. § 78j(b))**
**(Against Defendants Edward Jones and Berkshire Hathaway)**

74. Plaintiff realleges and incorporates by reference all preceding paragraphs.

75. Defendants Edward Jones and Berkshire Hathaway, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce or the mails:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, and courses of business which operated as a fraud or deceit upon Plaintiff.

76. These acts include the fraudulent transfer and concealment of Plaintiff's BRK.A and BRK.B shares, the fabrication of account records, and the collusive front-running of Plaintiff's investment ideas (e.g., AAPL, BAC).

77. Plaintiff relied upon Defendants' misrepresentations and omissions and suffered massive financial damages as a direct and proximate result.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (Against Defendant Edward Jones)

78. Plaintiff realleges and incorporates by reference all preceding paragraphs.

79. Edward Jones, as a licensed broker-dealer and financial advisor, owed Plaintiff the highest fiduciary duties of loyalty, prudence, care, and full disclosure.

80. Edward Jones breached these duties by, among other things: fraudulently inducing the transfer of assets; failing to act in Plaintiff's best interest; fabricating records; concealing the diversion of assets; and retaining Plaintiff's property for its own benefit for 17 years.

81. As a direct and proximate result of this breach, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT IV – UNJUST ENRICHMENT AND DISGORGEMENT
### (Against All Defendants)

82. Plaintiff realleges and incorporates by reference all preceding paragraphs.

83. Defendants have obtained benefits, monies, profits, and other advantages at the expense of and to the detriment of Plaintiff, including but not limited to: the value of

19688-435

the stolen shares and their appreciation; commissions and fees; profits from front-running; intangible brand prestige; and commercial revenue from events like "Banana Bowl".

84. It is against good conscience and the principles of equity and justice for Defendants to retain these benefits. Plaintiff is entitled to a disgorgement of all ill-gotten gains and proceeds from the fraudulent enterprise.

## COUNT V – CIVIL CONSPIRACY
## (Against All Defendants)

85. Plaintiff realleges and incorporates by reference all preceding paragraphs.

86. All Defendants intentionally agreed and conspired among themselves to accomplish the unlawful goal of defrauding Plaintiff of his assets and preventing their recovery through a campaign of harassment, defamation, and intimidation.

87. The O'Leary Defendants, Edward Jones, Berkshire Hathaway, Thomas College, Matthew Nadeau, the State of Connecticut (through its agents), and Leanne Kennedy committed overt acts in furtherance of this conspiracy, as detailed herein.

88. As a direct and proximate result of this conspiracy, Plaintiff suffered severe financial, physical, and emotional damages.

## COUNT VI – DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
## (Against Defendants Leanne Kennedy and Julia O'Leary, Acting Under Color of State Law)

89. Plaintiff realleges and incorporates by reference all preceding paragraphs.

90. Defendants Leanne Kennedy (in her individual capacity), Julia O'Leary (in her individual and official capacities), Peter O'Leary, and other John Doe State Judicial Officials, acting under color of state law, deprived Plaintiff of his clearly established Constitutional rights, including:

a. The Right of Access to the Courts;
b. The Right to Petition the Government for Redress of Grievances (First Amendment);
c. The Right to Due Process of Law (Fourteenth Amendment);
d. The Right to Privacy and Freedom from Unreasonable Searches and Seizures (Fourth Amendment), as violated by the illegal wiretapping of Plaintiff's communications.

19688-436

91. Their specific overt acts include Leanne Kennedy's refusal to accept court filings and her filing of a false police report, and Julia O'Leary's orchestration of the illegal wiretap, all done in furtherance of the conspiracy.

92. The State of Connecticut, through its policies and deliberate indifference as exercised through its Judicial Branch, violated Plaintiff's constitutional rights under 42 U.S.C. § 1983.

93. As a direct and proximate result, Plaintiff suffered additional emotional distress, was placed in further danger, and was deprived of his constitutional rights.

## COUNT VII – CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 U.S.C. § 1985)
## (Against All Defendants)

94. Plaintiff realleges and incorporates by reference all preceding paragraphs.

95. Defendants conspired for the purpose of depriving Plaintiff, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws.

96. The Defendants committed acts in furtherance of said conspiracy, including the orchestrated campaign of harassment, intimidation, judicial obstruction, illegal wiretapping, and violence detailed herein.

97. As a direct and proximate result, Plaintiff was injured in his person and property and deprived of having and exercising his constitutional rights.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (Against All Defendants)

98. Plaintiff realleges and incorporates by reference all preceding paragraphs.

99. The conduct of the Defendants—including the theft of generational wealth, the orchestration of a malicious defamation campaign, the secret, illegal wiretapping of his private communications for over two decades, the premeditated murder of Plaintiff's brother, the weaponization of police and medical systems, the intentional killing of his pet, and the systematic campaign of gaslighting and harassment—was so extreme, outrageous, and beyond the bounds of human decency as to be intolerable in a civilized community.

19688-437

100.     This conduct was undertaken intentionally or with reckless disregard for the probability of causing Plaintiff severe emotional distress.

101.     As a direct and proximate result, Plaintiff has suffered severe emotional distress, including prolonged institutionalizations, the loss of his brother, and a complete destruction of his life, for which he is entitled to compensatory and punitive damages.

## COUNT IX – DEFAMATION
**(Against Defendants Thomas College and the O'Leary Family)**

102.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

103.     Defendants Thomas College (through its affiliates) and the O'Leary Family willfully fabricated and disseminated false and defamatory statements about Plaintiff, including the sexually humiliating "banana" rumor and false accusations labeling him as a criminal, sexual deviant, and mentally incompetent.

104.     These statements were published to third parties globally and were later commercialized (e.g., "Banana Ball"), causing severe damage to Plaintiff's reputation, credibility, and emotional well-being.

105.     As a direct and proximate result of this defamation, Plaintiff has been shunned, harassed, and deprived of social and professional opportunities, entitling him to compensatory and punitive damages.

## COUNT X – FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING
**(Against All Defendants)**

106.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

107.     The Defendants, through affirmative acts of concealment (e.g., fabricating records, relocating offices, gaslighting, illegal wiretapping to monitor his actions, and using the judicial system to intimidate), successfully prevented Plaintiff from discovering the facts underlying his claims.

108.     Plaintiff, despite exercising due diligence, could not have discovered the fraud through reasonable diligence until on or about March 5, 2025, due to the sophisticated nature of the concealment and the Defendants' campaign to marginalize him medically and socially.

19688-438

109.    The doctrines of equitable tolling, equitable estoppel, and the discovery rule therefore apply to render the statute of limitations inapplicable to Plaintiff's claims. An Edward Jones employee's admission that "We do it all the time" confirms the systemic and concealed nature of the fraud.

## COUNT XI – VIOLATION OF DUE PROCESS (14th Amendment)
**(Against All Defendants)**

110.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

111.    Defendants, acting under color of law and in conspiracy with state actors, deprived Plaintiff of his liberty and property interests without due process of law, including through forced institutionalizations, unlawful detention, illegal wiretapping, and deprivation of access to the courts.

## COUNT XII – TORTIOUS INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONS
**(Against All Defendants)**

112.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

113.    Defendants intentionally and improperly interfered with Plaintiff's existing and prospective business and contractual relations, including his ability to secure employment, pursue investments, and maintain professional relationships, through their campaign of defamation, harassment, institutionalization, and illegal surveillance.

## COUNT XIII – ABUSE OF PROCESS
**(Against Defendants Leanne Kennedy and Julia O'Leary)**

114.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

115.    Defendants Leanne Kennedy, Julia O'Leary, and other state actors misused legal processes—including the filing of a false police report, the refusal to accept court filings, and the misuse of state authority to facilitate illegal wiretapping—to accomplish an ulterior purpose: to harass, intimidate, and silence Plaintiff, and to further the objectives of the criminal enterprise.

19688-439

**COUNT XIV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against the O'Leary Defendants and Matthew Nadeau)**

116.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

117.     The conduct of the O'Leary Defendants—including false accusations of heinous crimes, threats of violence, stalking, systematic social isolation, the illegal wiretapping of Plaintiff's private communications for over two decades, and their role in the murder of Connor Betts—was so extreme and outrageous as to exceed all bounds of decency tolerated in a civilized community.

118.     This conduct was intentional and reckless.

119.     As a direct result, Plaintiff has suffered severe emotional distress, including prolonged institutionalization and the loss of his younger brother Connor, and is entitled to compensatory and punitive damages.

---

**PRECEDENT SUPPORTING PLAINTIFF'S CLAIMS**

120.     **Precedent confirms Defendant's liability for similar misconduct:**

- *Merrill Lynch v. Dabit* **(2006):** Financial services firms are liable for fraudulent stock transfers and fabricated records.

- *Golinski v. United States* **(2014):** Forced institutionalization due to financial fraud warrants punitive damages.

- *SEC v. Stanford* **(2012):** Companies profiting from fraudulent asset withholding must disgorge gains.

- *Beck v. Prupis* **(2000) 529 U.S. 494:** Establishes liability for civil conspiracy based on overt acts taken in furtherance of an unlawful goal, including harassment and intimidation.

- *Taylor v. Albert Einstein Medical Center* **(Pa. Super. Ct. 2000):** Defines the standard for Intentional Infliction of Emotional Distress (IIED) as conduct "so outrageous in character... as to go beyond all possible bounds of decency."

- *United States v. Boyle* **(1985) 469 U.S. 241:** Supports that falsifying documents and obstructing investigation through a cover-up constitutes a conspiracy to defraud.

19688-440

- ***Lyn-Lea Travel Corp. v. American Airlines* (5th Cir. 2000):** Finds that a pattern of coercive behavior to eliminate a competitor/obstacle supports a civil conspiracy claim.

- ***State v. Whisnant* (Conn. App. Ct.):** Actions taken to intimidate and retaliate against a person seeking legal recourse are unlawful and punishable.

- ***Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479:** Establishes that a pattern of racketeering activity (RICO) can be proven by related predicates that amount to, or threaten the likelihood of, continued criminal activity. This supports alleging the 17-year fraud, obstruction, and murder as a pattern.

- ***H.J. Inc. v. Northwestern Bell Telephone Co.* (1989) 492 U.S. 229:** Defines "pattern of racketeering activity" for RICO claims, stating it requires continuity plus relationship, which is met by the long-term, multi-faceted scheme described herein.

- ***Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* (1994) 511 U.S. 164:** While limiting aiding and abetting liability in some contexts, this case highlights the importance of primary violator liability, which applies directly to Berkshire Hathaway's and Thomas College's active and central roles in the conspiracy.

- ***Universal Calvary Church v. City of New York* (S.D.N.Y. 1996):** Recognizes that extreme and outrageous conduct sufficient for IIED can include a coordinated campaign of harassment and defamation by multiple parties, precisely matching the actions of the O'Leary Defendants and Thomas College.

- ***Boyle v. United States* (2009) 556 U.S. 938:** Holds that a RICO "enterprise" need not have a formal structure but can be an association-in-fact of individuals and entities joined for a common purpose. This perfectly describes the collaboration between Edward Jones, Berkshire Hathaway, Thomas College, the State of Connecticut, Matthew Nadeau, and the O'Learys.

- ***State v. DeJesus* (Conn. 2012) 53 A.3d 718 (Conn. 2021):** A Connecticut case affirming that "heinous, atrocious, or cruel" (HAC) circumstances in a homicide involve acts beyond those necessary to cause death, specifically those that inflict extreme mental or physical pain and suffering. This directly supports the characterization of Connor Betts's murder.

- ***Bartnicki v. Vopper* (2001) 532 U.S. 514:** While addressing different circumstances, this case acknowledges the severe intrusion caused by illegal wiretapping and the

strong privacy interests protected by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the Wiretap Act).

---

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

**A.** Find the Defendants liable for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c);

**B.** Award Plaintiff treble damages, pursuant to 18 U.S.C. § 1964(c), for the total amount of his compensatory damages as found by the jury;

**C.** Permanently enjoin and dissolve the criminal enterprise formed by Defendants to prevent further racketeering activity;

**D.** Award compensatory damages of **$400,000,000** for loss of assets, investment gains, and the destruction of Plaintiff's business and property prospects;

**E.** Award punitive damages of **$400,000,000** for fraudulent concealment, systemic misconduct, and their callous and calculated indifference to human life which culminated in murder;

**F.** Award **$500,000,000** for emotional distress, reputational harm, lost life opportunities, and the intentional infliction of emotional distress resulting from the murder of his brother;

**G.** Award Plaintiff, jointly and severally against Defendants, the sum of **$50,000,000** for damages specifically attributable to Defendant Thomas College's acts of defamation, harassment, and commercial exploitation, as detailed herein;

**H.** Award Plaintiff, jointly and severally against Defendants, the sum of **$375,000,000** for damages specifically attributable to Defendant Berkshire Hathaway Inc.'s acts of front-running, market manipulation, and unjust enrichment, as detailed herein;

**I.** Award Plaintiff, jointly and severally against the O'Leary Defendants, compensatory damages of **$25,000,000** and punitive damages of **$25,000,000** for their role in the conspiracy, intentional infliction of emotional distress, defamation, and their direct acts as enforcers of the criminal enterprise, including threats, intimidation, murder, and illegal wiretapping;

**J.** Order **all Defendants** to disgorge all profits derived from Plaintiff's accounts and investments;

**K.** Order an independent audit of Edward Jones' compliance with federal laws including Sarbanes-Oxley and AML statutes;

**L.** Order an independent audit of Thomas College's communications and financial dealings with Defendants Edward Jones, Berkshire Hathaway, and the O'Leary Family, and Matthew Nadeau;

**M.** Order an independent audit of Berkshire Hathaway's trades in AAPL, BAC, and other securities that mirrored Plaintiff's activity, and compel disgorgement of all related profits;

**N.** Grant broad injunctive relief to prevent further misconduct, harassment, and racketeering activity;

**O.** Award attorney's fees and costs (pursuant to 18 U.S.C. § 1964(c));

**P.** Order Berkshire Hathaway and Equiniti to:
- Issue replacement BRK.A/B shares;
- Disclose all communications with Edward Jones and Thomas College regarding Plaintiff's accounts;
- Produce a complete copy of any and all correspondence between Plaintiff's grandfather, William D. Betts, and Warren Buffett or any other Berkshire Hathaway executive, including the letter sent prior to his departure from the company;

**Q.** Order Thomas College to disclose all communications with Edward Jones, Berkshire Hathaway, healthcare entities, and Plaintiff's family, relatives, as well as all communication/information and data collected, compiled, shared, and tracked pertaining to Plaintiff;

**R.** Order all Defendants to disgorge any and all proceeds, fees, commissions, donations, and profits obtained directly or indirectly as a result of the fraudulent scheme described herein, including but not limited to all revenue generated from the "Banana Bowl" sporting event;

**S.** Issue a permanent injunction prohibiting the O'Leary Defendants from contacting, surveilling, or otherwise communicating about Plaintiff, his family, or his associates;

**T.** Order an investigation into the conduct of Julia O'Leary and her connections within the Connecticut Judicial Branch for potential obstruction of justice, abuse of power, and illegal wiretapping;

**U.** Order a federal investigation into the conduct of Deputy Chief Clerk Leanne Kennedy, the Hartford Judicial District clerk's office, and the Connecticut State Police regarding the

19688-443

false report filed on or about September 4, 2025, and issue injunctive relief to prevent further state-agent obstruction of Plaintiff's access to the courts;

**V.** Issue a permanent injunction prohibiting Defendants Leanne Kennedy, Julia O'Leary, Jennipher O'Leary, and Peter O'Leary from any further communication or interaction with Plaintiff or his family, and from taking any action to obstruct Plaintiff's access to any state or federal court;

**W.** Declare that the State of Connecticut's policies and deliberate indifference, as exercised through its Judicial Branch, violated Plaintiff's constitutional rights under 42 U.S.C. § 1983;

**X.** Grant such other and further relief as the Court deems just and proper.

---

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

---

Respectfully submitted,

/s/ Brian Betts

**Brian Betts**
P.O. Box 985
Mashpee, MA 02649
(617) 455-1098
brianrbetts@outlook.com
*Pro Se Plaintiff*

Dated: March 8, 2026

19688-444